**Eugene VISLISEL, Plaintiff,**

v.

**Thomas K. TURNAGE, Administrator of Veterans' Affairs, Defendant.**

**No. C 86–0005.**

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

July 24, 1990.

Eugene Vislisel, pro se.

Paul C. Lillios, Asst. U.S. Atty., N.D. Iowa, and Earl Parsons, Sp. Asst. U.S. Atty., Dept. of Veterans Affairs, Des Moines, Iowa, for defendant.

## FINDINGS OF FACT CONCLUSIONS OF LAW AND ORDER

HANSEN, District Judge.

This case came on for trial before the court sitting without a jury on May 12 and July 14, 1989, when the plaintiff appeared *pro se*, and the defendant appeared by Paul C. Lillios, Esq., Assistant United States Attorney. Testimony was taken, evidence was received, and the arguments of the parties were made and heard. The court, having now had the opportunity to review the testimony and evidence and to consider the arguments of the parties, makes the following Findings of Fact, determines Conclusions of Law, and enters the following Order.

## FINDINGS OF FACT

1. This is a claim brought by the plaintiff pursuant to 42 U.S.C. § 2000e–3(a), alleging that his civil rights were violated by hiring officials at the Veterans' Administration Medical Center (VAMC) at Iowa City, Iowa. Specifically, the plaintiff claims that the defendant's appointing official, Jack G. Adams, retaliated against plaintiff for the filing of prior discrimination complaints against former employers and the Veterans' Administration (VA) by requesting plaintiff submit to a complete physical examination (and a psychiatric evaluation, if one was indicated as a result of the physical examination) as a prerequisite to further consideration of plaintiff's application for employment with the VA when no such examinations were required of other applicants for the clerk-typist position plaintiff sought. Defendant denies Mr. Adams had any retaliatory motive and asserts that Mr. Adams' request for a pre-employment physical examination was well-founded on legitimate non-retaliatory reasons.

2. From 1959 to 1962, the plaintiff was in and out of mental hospitals in Iowa, Minnesota, and Wisconsin. On May 31, 1967, S.M. Korson, M.D., Superintendent of Iowa's Mental Health Institute located at Independence, Iowa, signed and issued a certificate of discharge discharging the plaintiff from further mental health treatment as "cured." Plaintiff's exhibit 2. Plaintiff contends he is thus a member of a protected group of persons whom he describes generally as former mentally ill (but now cured) persons who, although they are not mentally impaired, remain mentally handicapped for employment purposes because of their prior mental illness. Plaintiff recorded his certificate of discharge as "cured" with the Recorder of Linn County, Iowa, so it is a matter of public record.

3. Plaintiff sought to be employed by the federal government, and he took the necessary examinations in 1977. In April, 1981, he took the rather unusual step of insisting that the Office of Personnel Management (OPM) in Kansas City include in his personnel file his certificate of discharge as "cured" from the Mental Health Institute. Plaintiff objected to OPM that there was no place on an OPM form for him to volunteer the information that he is a mentally handicapped person. *See* 29 U.S.C. § 706(8)(B) (1989) (which defines a "handicapped individual" for the purpose of subchapter IV and V of the Rehabilitation Act of 1973, as amended, as any person "who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities,

(ii) has a record of such an impairment, or (iii) is regarded as having such an impairment"). Plaintiff apparently considers himself to be in category (ii), since he testimonially denies having any present mental impairment. Plaintiff testified he wanted all federal agencies and the VA to know of his allegedly mentally handicapped status. Plaintiff is a veteran and was awarded a veteran's five-point preference in his OPM ratings.

4. He received no letters of inquiry concerning his availability for work until 1981, when the VAMC at Iowa City called him about a part-time clerk-typist position which was available. Plaintiff said he interviewed for the job but decided it would not pay enough to justify the drive from Cedar Rapids to Iowa City. Although the record is far from clear, it appears that the plaintiff's application was considered by the VAMC for a GS-3 clerk-typist position prior to August 18, 1981. To the best of his recollection, plaintiff was not interviewed for the job.

On August 18, 1981, the VAMC sent plaintiff a routine letter, defendant's exhibit 01, informing him of his non-selection. The very next day, without doing any investigation of any kind, the plaintiff sent a letter complaining of discrimination because of his non-selection. Plaintiff alleged in his letter that he was well-qualified for the position and claimed that the VAMC's failure to interview him and to hire him was based on "discrimination because of mental and physical handicap, sex and age." Defendant's exhibit P1. On cross examination, plaintiff admitted that he did not know who had been hired for the position, the gender of the successful applicant, whether or not the person was handicapped, or that person's age. Plaintiff testified he assumed there was a possibility he had been discriminated against and that he had used a "shotgun" approach in making his complaint.

Later in August 1981, the VAMC had an opening for a GS-2 file clerk. The plaintiff's name appeared on a list of eligible applicants furnished to the VAMC by OPM. The opening for the file clerk was in the medical records department where the job duties included pulling charts, answering the phone, signing out and keeping track of the location of medical records, and included personal contact with others. The Director of Medical Records, Gail Boxrucker Harrod, called the plaintiff to invite him for an interview. The telephone conversation began on a friendly tone. When Mrs. Harrod mentioned that there was also a GS-¾ position open in the Admissions Department that the plaintiff might also be interested in, the plaintiff became instantly hostile and accused Mrs. Harrod of discriminating against him and of trying to find a reason not to interview him. Mrs. Harrod assured the plaintiff that she was not discriminating against him and that she did want to interview him.

An interview was arranged for on or about August 24, 1981. The plaintiff arrived for the interview, and Mrs. Harrod began interviewing him by using a set of routine questions she had prepared for use with all of the applicants. Plaintiff began telling Mrs. Harrod about the various re-zoning cases and legal proceedings he was involved in and showed her numerous legal-looking documents. Fearing that she had lost control of the interview, Mrs. Harrod tried to refocus on the file clerk's opening. The plaintiff became very upset with her and accused her of discrimination against him and in not wanting to hire 50-year-old men. Plaintiff's sudden mood swing and change of behavior scared Mrs. Harrod, she became concerned, and she attempted to calm plaintiff down. She took him on a tour of the file room where the person to be hired would be working. Plaintiff criticized Mrs. Harrod's abilities as a supervisor. When he saw a sign on a wall saying in substance, "We, the unwilling, led by the unqualified, have been doing so much for so long with so little ...," plaintiff demanded that Mrs. Harrod remove it. She declined. Plaintiff remained hypercritical, rambled in his conversation, and remained hostile. It was not a positive interview, and Mrs. Harrod, who holds a college degree in medical records science and who at the time was supervising 13-14 employees,

determined that plaintiff would not be an effective medical records file clerk.

In her written report to the Personnel Office after the interview, defendant's exhibit U1, she noted that Mr. Vislisel was not acceptable because he "was belligerent and hostile and would have been difficult to supervise." At the time of her contacts with the plaintiff, Mrs. Harrod had no knowledge of or information available to her concerning the plaintiff's prior mental health problems or his prior proclivity for filing complaints of discrimination against former employers or potential employers, or that he had made such a complaint against the VAMC about one week before.

5. The plaintiff's letter of August 19, 1981 containing his discrimination complaint was directed to Charles Wilhite, one of the VAMC's duly appointed Equal Employment Opportunity (EEO) Counselors. Mr. Wilhite, a recreational therapy specialist, had been recommended for this additional duty by the employees' union. An EEO counselor's job is to listen to discrimination complaints, do an investigation, and attempt to resolve the complaint on an informal basis. Mr. Wilhite had previously processed several dozen complaints and had been an EEO counselor for six to seven years. Mr. Wilhite called the plaintiff on August 26, 1981, and had an extended discussion with him. The plaintiff had a number of complaints—ranging from zero lot line zoning in Cedar Rapids to the objectionable poster he had seen at the hospital which plaintiff said indicated to him that "people weren't doing their jobs." Mr. Wilhite made an appointment to see the plaintiff at 3 p.m. that same day in Mr. Wilhite's office. The plaintiff failed to appear. The next day, August 27, 1981, Mr. Wilhite called the plaintiff, and plaintiff insisted on being seen that day, claiming to have understood his appointment to be for that day. Mr. Wilhite had other activities planned for his patients and told plaintiff he could only allocate 15 minutes to plaintiff. Plaintiff arrived about mid-afternoon, just before Mr. Wilhite was leaving for an outing with patients away from the hospital. The meeting was not beneficial, with plaintiff telling Mr. Wilhite he just wanted to go through the motions of the required informal resolution before he filed a formal complaint. Plaintiff gave Mr. Wilhite the clear impression that plaintiff thought Mr. Wilhite was not doing Wilhite's job correctly, and that plaintiff intended to report Wilhite to another agency for not giving plaintiff proper counseling. Plaintiff testified at trial that Mr. Wilhite was "not learned in discrimination law."

6. Several other VAMC personnel saw the plaintiff on or about the time of his visits to the hospital. Charles Callen, an Employee Relations Specialist for ten years (and the person to whom plaintiff had addressed his August 19, 1981 letter), came in contact with the plaintiff when plaintiff complained that his scores on the OPM list were inaccurate. OPM had scored plaintiff at a 93 as a clerk typist and at a 98 as a clerk. Plaintiff thought both scores should be identical. When Mr. Callen told plaintiff he should complain to OPM since that agency had scored the test and not the VA, the plaintiff became nervous and annoyed, asserted that the VA was playing games with him, and accused the VA of not hiring disabled veterans. Mr. Callen, himself a disabled veteran, disputed the assertion. Later that day, Mr. Callen again saw the plaintiff when Jack G. Adams, the Personnel Officer at the VAMC, brought the plaintiff to Mr. Callen's office to make an appointment with Mr. Wilhite to file a complaint. Mr. Callen had a "Sylvester the Cat" cartoon poster on the back of his door, the caption of which, "Take your silly a___ed problems down the hall," deeply offended the plaintiff, and he demanded that Mr. Callen remove it. Callen did so. Plaintiff told Mr. Callen he had legal actions pending against the Internal Revenue Service and others including the VA Hospital at Knoxville where the plaintiff had apparently been treated. Plaintiff engaged in a very rambling conversation with Mr. Callen. Plaintiff claimed that the hospital had no EEO posters available for the public to read. Callen took him to the two EEO bulletin boards which displayed the names, pictures, and room numbers of the EEO counselors, together with other required

information concerning protected groups and time limitations. Because the hospital had recently undergone a room numbering system change, the posted room numbers were inaccurate. Plaintiff insisted that the posters were not "federal posters" and hence not proper. The meeting ended when plaintiff stated to Mr. Callen that the VA was just playing games with him, and plaintiff walked off down the hall.

Mr. Adams also had contact with the plaintiff that same day. The plaintiff appeared to Mr. Adams to be nervous, emotionally uptight, and very argumentative. He was visibly disturbed because he could not locate an EEO poster. When shown the one on the third floor complete with pictures, together with one in Spanish, the plaintiff complained that it was not the "federal poster." Plaintiff told Mr. Adams that he spent a lot of time at the University of Iowa law library, that he was well versed in the law, and that he was working on a zoning case in Cedar Rapids. Mr. Adams formed the opinion that the plaintiff was extremely argumentative, preoccupied with filing lawsuits, and appeared "troubled far beyond what would be normal."

On August 27, 1981, Edith Kurth, who was then working as a clerk-typist in the VAMC's Chief of Staff's Office, had occasion to see the plaintiff on four separate occasions. The first encounter occurred when plaintiff came in and said he was having a problem getting an appointment with an EEO counselor. Ms. Kurth, a seven-year U.S. Army sergeant/veteran herself, suggested that plaintiff try again and, if unsuccessful, she would try to help him. Plaintiff agreeably left. He returned in half an hour obviously agitated and upset, and Ms. Kurth directed him to the assistant director's office across the hall for assistance. He came back in ten minutes complaining that they were of no help at all. When Ms. Kurth said she could not help him any more than she had, the plaintiff became extremely angry and said, "I'll see you all in court." He asked for access to a xerox machine, and Ms. Kurth referred him to the administrative services office. Plaintiff returned in a half hour with a handwritten letter addressed to the Chief of Staff and asked Ms. Kurth to give it to the Chief of Staff. She did so. The letter, defendant's exhibit W2, reads as follows:

August 27, 1981

To: Chief of Staff
    VA Hospital
    Iowa City, Iowa

To: Respondents

The federal laws requires [sic] your hospital to make an EEO counselor *accessible* to myself as one having bona fide discrimination complaints in seeking employment. To date your hospital refused to do what is necessary to be in compliance in this regard. Consequently, this matter will be expected to be litigated in the courts.

Eugene Vislisel, Complainant

Plaintiff's contacts with Ms. Kurth were overheard by Mr. Adams across the hall. While Mr. Adams remembers the plaintiff as not being impolite to Ms. Kurth, he does remember that plaintiff was threatening and dogmatic in tone and acted in a generally disruptive manner.

Plaintiff's handwritten letter to the Chief of Staff was flatly wrong. At the time he wrote the letter, plaintiff had already conferred extensively with EEO counselor Wilhite on the telephone, had seen Wilhite in person as plaintiff said, "only [to] go through the motions," had met with Mr. Callen twice concerning his OPM scores, and had also met with a Mr. Colston who had explained employment procedures.

7. On September 9, 1981, Mr. Wilhite, the EEO counselor, wrote the plaintiff a letter informing the plaintiff of his right to file a formal discrimination complaint within 15 days.

8. The plaintiff remained on the list of eligible applicants furnished to the VAMC by OPM and was considered from time to time for employment for file clerk and clerk-typist positions as they came open. On September 15, 1981, Mr. Adams, the personnel officer, sent a memorandum to Dr. P.E. Kuhl, the VAMC's Employee Health Physician, requesting that "a complete pre-employment physical examination including a psychiatric assessment if

deemed appropriate be conducted on Eugene V. Vislisel, a candidate for employment at this Medical Center." Plaintiff's exhibit 1. It is this memorandum and the resulting request made of the plaintiff that he submit to such an examination which plaintiff contends represents retaliatory action and a reprisal taken against him by the VA for making his complaint of employment discrimination against the agency.

Paragraphs 2 and 3 of Mr. Adams' September 15, 1981 memorandum are of enough significance to quote here:

2. Mr. Vislisel has recently been certified to this Medical Center by the Office of Personnel Management as a candidate for File Clerk, GS–305–2; Clerk Typist, GS–322–3; and Claims Clerk, GS–998–3 and 998–4. He was not selected for Clerk Typist in Radiology Service and Claims Clerk, Ambulatory Care Section, Medical Administration Service. Upon written notification that he was non-selected, Mr. Vislisel filed a complaint with this Medical Center alleging discrimination due to mental and physical handicap, sex and age.

3. Further, during his interviews with Mr. Chuck Callen, Personnel Management Specialist, and with Mr. Charles Wilhite, EEO Counselor, regarding the complaint of alleged discrimination, Mr. Vislisel made reference to his treatment at the VA Medical Center, Knoxville, Iowa. Mr. Vislisel also details in his application a discrimination complaint he filed against Collins Radio of Cedar Rapids based on physical handicap. These reasons, in addition to Mr. Vislisel's somewhat peculiar and erratic behavior while visiting the Medical Center, have caused me to become suspect of his physical and emotional capabilities to satisfactorily perform the duties of the position for which he is now being considered, File Clerk, GS–305–2.

Plaintiff declined to be examined by the Employee Health Physician.

Mr. Adams, as the appointing official, had the discretionary authority to obtain a medical report on Mr. Vislisel pursuant to the provisions of the Federal Personnel Manual. *See* para. 3–2(b)(4), defendant's exhibit B1. On October 20, 1981, believing that the plaintiff was unsuitable for employment in a medical setting because of plaintiff's demeanor, conduct, and interaction with staff which he had both personally observed and which had been reported to him, Mr. Adams initiated a proceeding with OPM to object to the plaintiff as an "eligible" candidate for employment at the VAMC. His request was granted on June 11, 1982, and Mr. Vislisel was removed from consideration. The OPM determined not to recertify Mr. Vislisel to the VAMC, Iowa City.

9. In the interim, the plaintiff remained "eligible" for employment, and he was interviewed for three different file clerk/clerk-typist positions at the hospital.

In February of 1982, plaintiff was interviewed for a position as a claims clerk in the admitting section of the hospital where veterans have their first encounter with hospital personnel. The position is a stressful one, and the employee must meet and handle all types of patients and admitting situations. Some patients are in the custody of police officers, some are quite ill, and some present a medical emergency. The position requires a person who can make an immediate and appropriate response and obey instructions without argument. When the job requirements were outlined to the plaintiff by the Chief of the Ambulatory Care Processing Section, the plaintiff responded by pulling out a thick briefcase and telling the interviewer about two appeals the plaintiff had pending in the Supreme Court of Iowa. The interviewer tried to refocus the interview on the job opening at hand, but plaintiff persisted in talking about his pending appeals. Based upon the plaintiff's demeanor, his high state of nervousness, his rambling conversation, his lackadaisical attitude, and the fact that the interviewer could not maintain the plaintiff's full attention, the interviewer formed the opinion that the plaintiff would be unable to handle the type of work the open position required. Before the interview, the interviewer had no information about any of the plaintiff's prior difficulties

or of any complaints of discrimination plaintiff had made.

James R. Quinley was the Administrator of Radiology Services at the VAMC when he interviewed the plaintiff for a file-clerk position in the radiology file room. The job required rather heavy lifting, bending, and stooping. The plaintiff appeared for the interview carrying a plastic shopping bag from which he pulled out his legal briefs to show to Mr. Quinley. Quinley testified that he lost control of the interview initially and, once he regained control, the plaintiff inquired whether Quinley had any problem employing people with mental problems. Plaintiff told Quinley that because of his existing back trouble he would not be able to do the job on a consistent basis and would need a week off every two to three weeks. Before the interview Mr. Quinley was unaware of any prior problems the plaintiff may have had.

Patricia Knebel, who supervises over 70 people in the medical laboratory at the VAMC, interviewed the plaintiff for a position of clerk in the urinalysis/hematology lab. The lab is a very busy, hectic place with phone calls coming in on ten lines. The clerk would interact with all of the wards of the hospital and must be capable of extremely accurate and precise work. An ability to concentrate is essential, and the position requires a calm, diplomatic, tactful person. When Ms. Knebel interviewed the plaintiff, he presented her with three to five briefs about a sewer complaint. When she tried to get the plaintiff back on track for the interview, she was unsuccessful, and plaintiff then presented her with his litigation pending about the VA. The only relation between those matters and the job opening at hand apparent to Ms. Knebel was that the papers showed the plaintiff's typing skill. After a tour of the laboratories, Ms. Knebel asked the plaintiff if he was interested in the job and if he was available. Plaintiff acted insulted, became agitated, nervous, and argumentative. He also hunted amongst his papers for his mental health certificate but could not find it, and he felt that Ms. Knebel should have had it with his application.

Ms. Knebel formed the opinion that the plaintiff was ill-suited to work in the laboratory in that he would find it difficult to stay on task and not let interruptions and emergencies upset him. At one point in the interview, after the tour, the plaintiff told Ms. Knebel that there was a network of nurse spies across the country who made sure that former mental patients never found employment. After the interview concluded, Ms. Knebel informed the personnel office that the plaintiff could not handle the requirements of the open position. Prior to the interview, she had no information concerning any prior difficulties the plaintiff may have experienced, nor was she aware of any discrimination complaints he had made.

10. Plaintiff has had little gainful employment over many years. The most recent full-time job he had was as a GS-4 clerk-typist for the Federal Grain Inspection Service from which he was fired for insubordination in March, 1985, after working for one year. He filed a discrimination complaint against that employer. In the early 1960s, he worked in three-month stints for the City Assessor. He was employed for three months by the Postal Service and fired. He worked for four months for a greenhouse. Plaintiff worked for Rockwell–Collins for two months in 1976 and was terminated because of his back trouble. He filed a discrimination complaint against Rockwell–Collins which the Iowa Court of Appeals rejected. He has filed both retaliation and denial of veteran's preference claims against the University of Iowa. *See Vislisel v. University of Iowa,* 445 N.W.2d 771 (Iowa 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1137, 107 L.Ed.2d 1042 (1990). He has filed a discrimination complaint against the U.S. Geological Survey. He has filed two complaints against the Internal Revenue Service. He was successful in a complaint lodged against the Iowa Department of Job Service. He filed a claim against the Iowa Men's Reformatory at Anamosa (after he went for an interview) but failed to prosecute it. He also filed complaints against the Joint Partnership Training Act orga-

nization in the 1980s. Plaintiff candidly admitted that he applies for work at places where he knows he can bring a discrimination complaint if he is not hired, and that he files a discrimination complaint when he is not hired in order to discover why he was not hired. The court reluctantly finds that Mr. Vislisel is a walking discrimination complaint in search of a place for filing.

11. The plaintiff has filed administrative complaints concerning his nonemployment by the VA. Plaintiff alleged in those proceedings that he was a victim of age, sex, and handicap discrimination. The Equal Employment Opportunity Commission's (EEOC) Office of Review and Appeals issued its decision in Appeal No. 01860154 on September 1, 1987, and affirmed a prior final agency determination made by the VA that no discrimination because of age, sex, race, or handicap had occurred. The plaintiff moved to include a review of that final agency action in this proceeding. The defendant did not resist, and the court, by order entered on January 11, 1988, reserved ruling on the plaintiff's motion. It should be remembered that the plaintiff's right to bring a Title VII action in court exists independent of his administrative remedies and that the commission's determinations have no preclusive effect on the court case.

In a separate (but related) matter, the EEOC had ruled on March 26, 1987, in EEOC Appeal No. 01862729, that the VA's cancellation of a prior discrimination complaint filed by the plaintiff was proper. The VA had dismissed the plaintiff's complaint because the plaintiff had failed to prosecute it by refusing to meet with an investigator assigned to investigate the complaint. Plaintiff requested that the EEOC reopen and reconsider its decision of March 26, 1987. By order entered August 21, 1987, the EEOC denied plaintiff's request to reopen. Plaintiff's request was assigned Request No. 05870252. Instead of filing a separate action, plaintiff moved to include a review of that agency action as part of this case. This court reserved ruling on plaintiff's motion until the merits of the case were heard.

At trial, plaintiff offered no evidence concerning the denial of his Request No. 05870252, and none of the evidence introduced at trial touched on the issues raised by the EEOC's denial of the plaintiff's request to reopen Appeal No. 01862729. All the court has before it is the EEOC's written decision not to reopen and the plaintiff's motion attacking that decision.

With respect to Appeal No. 01860154, the court finds that the issues raised before the EEOC involve some of the same issues and evidence introduced at trial.

### CONCLUSIONS OF LAW

1. The court has personal jurisdiction over the parties to this litigation and subject matter jurisdiction over the controversy raised by the pleadings. 28 U.S.C. § 1331.

2. The evidence supporting plaintiff's complaint alleging retaliation against him for engaging in a protected activity (the filing of discrimination complaints) can be analyzed in two different and distinct ways.

■ a. *McDonnell Douglas test.* The Eighth Circuit has held that the "order and allocation of proof in [T]itle VII suits generally ... is also applied in cases alleging retaliation for participation in [T]itle VII processes." *Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir.1980) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668, (1973)), *cert. denied,* 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). Under the *McDonnell Douglas* analysis, the plaintiff must first make out a prima facie case of retaliatory action. Then the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for the alleged retaliatory action. If such a legitimate nondiscriminatory reason is advanced, then plaintiff can still prevail if plaintiff shows that the proffered reason was, in fact, a pretext, i.e., a cover-up for retaliation. *Womack,* 619 F.2d at 1296. A *McDonnell Douglas* prima facie case means the "establishment of a legally mandatory, rebuttable presumption," rather than the presentation of "enough evidence

to permit the trier of fact to infer the fact at issue." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 1094 n. 7, 67 L.Ed.2d 207 (1981). Stated another way, a *McDonnell Douglas* prima facie showing is "proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978). *See* C. Richey, *Manual on Employment Discrimination Law and Civil Rights Actions in the Federal Courts* § A.X., at A–45–46 (Federal Judicial Center January 1988 ed.).

> In order to establish a *prima facie* case of retaliation, the plaintiff has to show that (1) [he] engaged in a protected activity; (2) that adverse employment action occurred; and (3) that there is a causal connection between the two. (Citations omitted.)

*Sherpell v. Humnoke School Dist. No. 5*, 874 F.2d 536, 540 (8th Cir.1989) (citing cases). Sometimes a *fourth element is added* which requires plaintiff to prove the defendant's awareness of plaintiff's engagement in protected activity. *Couty v. Dole*, 886 F.2d 147, 148 (8th Cir.1989) (retaliatory discharge).

Using a *McDonnell Douglas* elements analysis, plaintiff has proved that he was engaged in a protected activity, i.e., he had filed and was processing discrimination complaints against the VAMC at the very same time that he was being interviewed and considered for employment at the VAMC.

It is not entirely clear from this evidence what adverse employment action plaintiff claims he suffered, i.e., referral for a medical evaluation, nonselection, or the VA's attempt to have him removed from the list of "eligibles." However, in paragraph 10 of Count II of his complaint, plaintiff alleged:

> 10. That defendant's refusal to process plaintiff's application for employment in the same manner as was done for other applicants' [sic] and because plaintiff had filed with EEOC a charge against another employer or prospective employer violated Civil Rights Act of 1964, section 704(a), 42 U.S.C.A., section 2000(e)–3(a).

In paragraphs 1 and 2 of that same count, plaintiff set out Mr. Adams' action in requesting a medical evaluation of the plaintiff. Hence, it would appear from plaintiff's pleading that the adverse employment action he complains about was Mr. Adams' attempt to have plaintiff undergo a preemployment medical evaluation, when other applicants for the same position were not so required. The court has some doubt that the referral of the plaintiff to the medical staff for a medical evaluation is the kind of adverse employment action which gives rise to a Title VII action under the facts of this case, because the request had no effect upon the ultimate decision made by the VAMC not to hire the plaintiff. Stated another way, the reason the plaintiff was not hired had nothing to do with his refusal to accede to Mr. Adams' request that he be examined by a doctor. However, assuming for the purposes of the case that the referral for a medical evaluation was the adverse employment action plaintiff complains about, the court proceeds to determine whether there is a causal connection between the plaintiff's protected activity and Mr. Adams' request for the medical evaluation. The principal evidence of that causal connection relied upon by the plaintiff is Mr. Adams' referring memorandum, plaintiff's exhibit 1, found in paragraph 8 of the Findings of Fact above. After setting forth the fact that plaintiff had filed discrimination complaints against the VA based on mental and physical handicap, age, and sex, and against his prior employer Collins Radio based on physical handicap, Mr. Adams says in his referring memorandum, *"These reasons*, in addition to Mr. Vislisel's somewhat peculiar and erratic behavior while visiting the Medical Center, have caused me to become suspect of his physical and emotional capabilities to satisfactorily perform...."* (Emphasis added). One logical inference to be drawn from the referring memo is that the re-

quested medical evaluation was requested just because plaintiff had, in fact, filed previous discrimination complaints; another is that the plaintiff's observed behavior at the Medical Center was the precipitating reason for the request; and another is that a combination of the two resulted in the request. On balance, the court concludes that, for the purpose of the *McDonnell Douglas* test, the plaintiff has shown his prima facie case.

Under *McDonnell Douglas,* the burden of production now shifts to the defendant to articulate a legitimate nondiscriminatory reason for making the request for a medical evaluation. The defendant has done so. The evidence clearly shows that, at the time Mr. Adams made the request, he had been informed by members of his staff concerning the plaintiff's overly aggressive, demanding, belligerent, obnoxious, overbearing, disputatious, litigious, disruptive, hostile, argumentative, and peculiar behavior which the plaintiff had so boorishly demonstrated to several of the VAMC's staff. Mr. Adams himself had observed that behavior firsthand on two different occasions and had come to the initial opinion that the plaintiff was a troubled person. Some of the behavior was exhibited to staff members while plaintiff was in the act of filing his discrimination complaint, and that is what makes the case difficult to analyze, i.e., the VA's knowledge of the plaintiff's questionable behavior came hand-in-glove with the knowledge of his protected activity.

The VAMC is firmly committed to a policy of hiring qualified people regardless of any handicap they may exhibit. It received the Employer of the Year Award presented by the Iowa Governor's Committee on Employment of the Handicapped in 1984, and was named Employer of the Year in 1983 by the Johnson County Citizens' Committee for the Handicapped. It follows an affirmative program to accommodate employees with handicaps so that they can be and remain employed. Mr. Adams, as the personnel officer, is the principal person responsible for implementation of that program. He knew from plaintiff's own application form that plaintiff had alleged that a prior employer had discriminated against him because of a physical handicap. He did not know if plaintiff had any kind of a handicap which could or should be accommodated if plaintiff was employed at the VAMC, but he had reliable information indicating that plaintiff did have a handicap. He had the discretionary authority to request a preemployment physical examination to help make that determination. The court concludes that the defendant has shown that Mr. Adams had legitimate nondiscriminatory reasons "to become suspect of [plaintiff's] physical and emotional capabilities to satisfactorily perform" and to request the medical evaluation.

As defendant has shown legitimate nondiscriminatory reasons for requesting the medical evaluation, the plaintiff now is afforded the opportunity under *McDonnell Douglas* to show that the articulated reasons are pretexts, i.e., cover-ups for retaliation for filing discrimination complaints. Plaintiff has failed to so show. After a review of all of the evidence, the court concludes that no retaliatory motive was involved in Mr. Adams' request for a medical evaluation of the plaintiff. He had reasonable grounds to believe that plaintiff may not have the physical and emotional capabilities required to work in the demanding and stressful atmosphere of a major medical center. While the source of some of Mr. Adams' information may have come from the context of the prior discrimination complaints filed by the plaintiff against his former employer (Collins Radio) and the VA itself, the court is convinced that it was the information about the plaintiff Mr. Adams had acquired which prompted his referral, and not the fact that the plaintiff had so forcefully asserted his right to file discrimination complaints. Stated yet another way, it was the plaintiff's mental and physical condition, as reported to Mr. Adams and as observed by him, which prompted his request for a medical opinion, and it was not the plaintiff's proclivity for filing discrimination complaints. The court finds specifically that this is not a mixed motive case. Plaintiff has failed to prove his claim of retali-

atory action for engaging in protected activity under the *McDonnell Douglas* analysis.

[2] b. *"Direct evidence test."* *McDonnell Douglas* is not the exclusive method for proving a claim of discrimination. *DeHues v. Western Elec. Co.,* 710 F.2d 1344, 1347 (8th Cir.1983). *McDonnell Douglas* is not "an inflexible formulation." *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). In fact, the Supreme Court has held that, where the plaintiff presents direct evidence of discrimination, the *McDonnell Douglas* test is inapplicable. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985). *See also Perry v. Kunz,* 878 F.2d 1056, 1058 (8th Cir.1989); *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 774 (11th Cir.1982) ("Moreover, where a case for discrimination is proved by direct evidence, it is incorrect to rely on a *McDonnell Douglas* form of rebuttal.").

Here, the "direct evidence" of the alleged discrimination consists again of Mr. Adams' September 15, 1981 memorandum referring the plaintiff to the medical staff for a medical evaluation. The letter closely followed the plaintiff's filing of a discrimination complaint against the VA and the VA's acquisition of knowledge about the plaintiff's prior complaint against Collins Radio, and, as noted above, the memorandum itself recites that the plaintiff has, in fact, filed such complaints.

Opposing that evidence is the substantial evidence in this record concerning the plaintiff's abnormal behavior during his contacts with VA personnel, including his inability to take part in any job interview in a constructive, mature, and businesslike way. Every interviewer had much the same impression concerning the plaintiff's oft demonstrated inability to get along in the work setting and to stay on task and be productive. Plaintiff's obsession with his many different law cases and his thinly veiled threats of future litigation if everything did not go just his way raised very serious questions about his mental capacity to focus on and to do the work for which the job opening existed.

In examining the evidence under the *McDonnell Douglas* analysis, the court became convinced that the defendant's "articulated" nondiscriminatory reasons for the referral to the medical staff were not only legitimate, but were also the real reasons why the referral was made. The court remains so convinced, even under a "direct evidence" test. The defendant has proved to the court by clear and convincing evidence that no retaliatory motive prompted the referral of the plaintiff for a medical examination. The court is convinced that Mr. Adams would have referred the plaintiff for a medical evaluation based on the plaintiff's observed behavior and interaction with numerous staff members, even if Mr. Adams had had no knowledge of the plaintiff's prior protected activity.

Plaintiff has failed to prove his retaliation claim under the dual alternative direct evidence analysis.

■ 3. Plaintiff's motion that this court review the EEOC's denial of his Request No. 05870252 to reopen Appeal No. 01862729 must be denied. Plaintiff has wholly failed to offer any evidence showing that the agency's denial was wrong. Based on what is before the court (the agency decision and the defendant's motion), the court cannot say that the agency's decision denying reopening should be disturbed.

4. Likewise, plaintiff's motion that this court review the EEOC's decision affirming the VA's final agency determination that the VA had not discriminated against the plaintiff because of age, sex, or physical or mental handicap should be denied. Plaintiff has been given a *de novo* review in this litigation based on his federal court complaint. This court's detailed review of all of the evidence concerning the interaction between the plaintiff and the VAMC convinces it that the VAMC did not discriminate against the plaintiff in any manner. He was not hired for the several good and sufficient reasons articulated by the persons who interviewed him for the open positions and who testified at trial, and his

exercise of his statutory civil rights had nothing to do with these decisions not to hire him. Neither was the plaintiff's age, his sex, or any mental or physical handicap he may have used against him in the hiring decisions.

A review of the EEOC decision reveals that the agency essentially performed a *McDonnell Douglas* analysis in determining that plaintiff had no valid discrimination complaint for his not being hired.

Finding no error in the EEOC decision in Appeal No. 01860154, the court will deny plaintiff's request concerning that decision.

### ORDER

Accordingly, It Is Ordered:

1. Plaintiff's complaint is dismissed with prejudice.

2. Plaintiff's application to review the EEOC's denial of plaintiff's Request No. 05870252 to reopen Appeal No. 01862729 is denied.

3. Plaintiff's application to judicially review the EEOC's decision in Appeal No. 01860154 is denied.

4. Costs shall be taxed against the plaintiff and in favor of the defendant.

5. The clerk shall enter judgment accordingly.

Done and Ordered.